**Application of John E. BORAH.**
**Patent Appeal No. 7450.**

United States Court of Customs
and Patent Appeals.
Jan. 6, 1966.

Marmaduke A. Hobbs, South Bend, Ind., William T. Estabrook, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–4 and 11–13 of application serial No. 11,533, filed February 29, 1960, for "Molding Apparatus."

The sole ground of rejection before us is double patenting. The examiner made additional rejections on prior art but the board reversed them. The board also reversed the double patenting rejection of claims 6, 8, 9, and 10, which stand allowed. The reference relied on to support the double patenting rejection is appellant's own patent:

Borah      2,983,953      May 16, 1961.

Double patenting issues come before us on a great variety of fact situations. Generally speaking, the present case is one in which the applicant, after filing an application for patent on a machine, made further developments or improvements and a few months later filed a second application disclosing the improvements along with the basic machine in which they were incorporated, which basic machine was itself an improvement of an old and well-known molding press of the hydraulic ram, heated platen type. The second or improvement application enjoyed a speedy prosecution in the Pat-

ent Office and a patent issued thereon about nine months after it was filed. Meanwhile the first application met with continuing rejection and on the third action, given six months after the applicant's patent issued, faced the additional rejection of double patenting. The examiner thus stated his position as to the appealed claims in his initial double patenting rejection:

Claims 1–4, 11–13 * * * are rejected on the ground of double patenting. The claims do not patentably distinguish over claims 4 and 5 of applicant's own patent No. 2,983,953. The claims appear to differ from the allowed [i. e. patented] claims only in scope.

Subsequently, and after the applicant had evidently contended, on the basis of differences between the patent and application claims, that there was no double patenting, the examiner gave his final rejection in which he newly cited three references "of interest"[1] on which he relied to show that some of those differences, at least, were "old in the art." However, he made no reference to these references in his answer, the board neither mentioned nor relied on them in its opinion, and they have not been included in the record in this court. Under the circumstances, they are not before us. There is only one reference before us and that is Borah's patent.

To differentiate this case from many other double patenting situations, we note that it involves no assignment, terminal disclaimer, or diversity of inventorship. The sole question is whether an individual applicant is precluded from obtaining the appealed claims by reason of claims he has already obtained in his patent.

1. Novotny, 1,993,942, Mar. 12, 1935; Rieser, 2,239,248, Apr. 22, 1941; Clark, Jr., 2,289,102, July 7, 1942.

2. When we use the term "invention" we do so without any implication of patentability and only to refer to the thing invented regardless of its patentability. One of the sources of confusion in this

*The Inventions*

As above indicated, we are not concerned with a single invention but with the inventions disclosed in the first-filed application (here on appeal) *and* the improvement inventions disclosed in the Borah patent which issued on the later-filed application.[2] We will describe them in that order.

The conventional prior art hydraulic platen press has upper and lower platens, arranged horizontally and parallel, the upper platen being fixed on the four corner posts of the press and the lower platen being pressed upwardly toward it by the hydraulic ram. Various kinds of molds in which molded articles are made can be squeezed between the platens. The mold used to illustrate the inventions is a four-part transfer mold consisting of a plunger plate which is attached to the upper platen, a bottom plate on the lower platen which is raised and lowered by the ram and upper and lower intermediate plates which get squeezed between them. The lower intermediate plate is the one which carries most of the cavities in which the articles are shaped and is also known as the cavity plate. The upper intermediate plate carries molding material, such as rubber, has holes or sprues through which it is squeezed into the cavities by the plunger plate, and is also known as the pot well plate.

The press itself being conventional equipment, the inventions all relate to the supporting and handling of the two intermediate mold plates and the bottom mold plate in the course of repeated molding operations. During molding it is necessary, in some cases, to fill up the bottom plate with metal inserts to be incorporated in the molded articles. To this end it is desired to slide the bottom plate out of the press. Similarly, one desires to slide out the cavity plate to knock out the molded articles and in so

case and in many prior opinions is due to viewing two or more inventions as but one "invention" because the differences between them are not regarded as patentable differences. For further elaboration of this point see the concurring opinion in In re Zickendraht et al., 319 F.2d 225, 50 CCPA 1529.

doing one may have to invert the plate. When the press is opened it is also desired to separate the parts of the mold from one another forcibly, as they may tend to stick together.

The initial inventions made by Borah and described in the first-filed application at bar reside in adding to a standard press the following features of construction: a vertically movable suspension for the upper intermediate or pot well plate in the form of four vertical rods fixed to the plate and slidably suspended in brackets attached to the upper part of the press, having adjustable stop nuts determining the lowered position; a similar suspension for the lower intermediate or cavity plate but with longer rods, these rods supporting horizontal grooved tracks in which a flange on the plate slides, the tracks extending outwardly of the press so the plate can be moved from between the platens; recesses in the tracks and trunions on the plate flange so arranged that when the plate is outside the press it can be swung into an inverted position for emptying; and a second pair of grooved tracks associated with the lower platen so the bottom plate of the mold can be slid outwardly of the press for filling with inserts. In operation, when the press is closed all four plates of the mold are pressed together. When the press opens, the bottom plate moves downwardly with the lower platen and the two intermediate plates, absent sticking, drop down on their suspension shafts by gravity, stopping at different levels. The cavity plate can then be pulled out on its tracks, dumped by inversion, righted, and slid back in place for the next operation. If inserts are being used, the bottom plate can be slid out and filled and returned. Since the mold plates are made of steel and desirably may be quite large with many mold cavities for efficiency, they are very heavy and the handling mechanism above described makes it possible for a single operator to manipulate them. What we have referred to as tracks are alternatively termed rails.

This basic novel combination was refined and further mechanized by Borah after filing his first application, the particulars relevant here being the following: to prevent hanging up of the pot well or upper intermediate plate, due to sticking when the press opens, he added to its suspension shafts what his brief refers to as "spring-kickers"; also the four simple shafts supporting the cavity plate were replaced by the piston rods of four hydraulic cylinders primarily for the purpose of serving as "pressure equalizers" which can be used "either to lift and lower the tracks [for the cavity plate] or merely to lower the tracks." There were other minor refinements and the addition of a knock-out mechanism for removing molded articles from the cavity plate which we need not consider. The improved machine was fully described in the second application, which issued as the reference patent, as though the whole were an independent invention, the specification containing, however, the general statement:

The present apparatus is an improvement on the apparatus disclosed and claimed in my copending application Serial No. 11,533 filed February 29, 1960.

Nothing more was said about what the earlier application invention was or how it had been improved.

For better understanding of the discussion, we must describe in more detail the "spring kickers" which help to separate the top mold section from the upper intermediate mold section. The latter is suspended on four vertical sliding shafts, as above stated. The improvement consisted in adding ball bearings for the shafts to slide in, mounting cylinders on the supporting brackets into which the ends of the shafts moved when the press closed, the cylinders being a little longer than the distance traversed by the shafts, adding a flange to the top of each shaft and putting a short section of coil spring in each cylinder. An adjustable screw plug closes each cylinder. When the press is closed, the coil springs are compressed between the flanges on the shafts and the screw plugs. When the press opens, the springs act on the shafts to "kick" the upper intermediate plate car-

ried by them loose from the top mold plate to overcome sticking. The spring tension can be adjusted by moving the plugs in or out.

Fig. 4 of the improvement patent drawings, with the names of parts added, will aid in understanding both the basic and improved structures.

May 16, 1961

J. E. BORAH

2,983,953

PRESS WITH POWER DEVICE FOR OPENING AND HANDLING MULTIPLE SECTION MOLDS

Filed Aug. 12, 1960

14 Sheets—Sheet 4

FIG. 4

INVENTOR.

JOHN E. BORAH

BY *M. A. Hobbs*

ATTORNEY

One of appellant's principal points in argument is that

In every claim of the appellant's issued patent, one, two or three of these additional mechanisms have been specifically recited, thus claiming a *new* and *different* combination than is being claimed in the present application. [Emphasis ours.]

While this is true, the legal issue is whether this is enough. The truth of the statement may be seen by inspection of the only two of the patent claims relied on for the rejection, claims 4 and 5, the new and different additional mechanism which makes the new and different combination being italicized [breakdown format supplied by us]:

4. A mold operating and handling apparatus for use in conjunction with a press having a ram, a head, and platens operatively connected to said ram and head, and with a mold having a top and bottom and upper and lower intermediate sections, comprising

[A'] a pair of spaced parallel rails mounted on opposite sides of said ram platen and extending from the press for moving said bottom section from a position directly above said ram platen to a position beyond the press,

[A] a pair of horizontally disposed vertically movable rails above said first mentioned pair of rails spaced laterally from one another and extending from the press for supporting said lower

[L] intermediate section,

[B] a pair of vertical shafts spaced along each of said second mentioned rails and extending upwardly on opposite sides of the press,

[Z] *a hydraulic cylinder connected to each of said vertical shafts for moving said second pair of rails downwardly to a predetermined position,* means for inverting said lower intermediate section,

[C] a pair of vertical shafts at each
[U] end of the upper intermediate

mold section and extending upwardly on opposite sides of the press and having a stop means for determining the lowermost position of said intermediate mold section,

[Y] *a cylindrical member around each of said second mentioned vertical shafts, and a spring reacting on each of said shafts for applying an initial force in the direction to separate said upper mold section and said upper intermediate mold section.*

5. A mold operating and handling apparatus for use in conjunction with a press having a ram and a head, and with a mold having a top and bottom and upper and lower intermediate sections, comprising

[A] a pair of horizontally disposed vertically movable rails spaced laterally from one another and extending from the press,

[B] a pair of vertical shafts spaced along each of said rails and extending upwardly on opposite sides of the press for supporting said lower intermediate section,

pivot means between said lower intermediate section and said rails for inverting said lower intermediate section,

[C] a pair of vertical shafts at each end of the upper intermediate mold section extending upwardly on opposite sides of the press and having a stop means for determining the lowermost position of said intermediate mold section,

[Y] and *a spring reacting on each of said shafts for applying an initial force in the direction to separate said upper mold section and said upper intermediate mold section.*

The bracketed letters are added to key in with appellant's argument, later referred to. For comparison with these patent claims we now present the broadest application claim on appeal:

4. In a mold manipulating apparatus for use in conjunction with a press

having adjacent upper and lower platens and with a mold having a top and bottom and intermediate sections:

[A] a pair of horizontally disposed tracks movable vertically and relative to both said adjacent platens and spaced laterally from one another and extending from the press, and

[B] means suspending said tracks between said upper and lower platens in spaced relation thereto for determining the downward travel of said tracks,

[C] the intermediate mold section having a portion supported by said tracks and movable from a position between said top and bottom mold sections to a position beyond the press.

It is self-evident that application claim 4 is broader than patent claims 4 and 5 and that the improved structure described and claimed in the patent would be dominated by the appealed claim 4, the same being true of the other appealed claims. Appellant has described his situation by an alphabetical shorthand which is not entirely accurate but will suffice for illustration. He thus analyzes the claims of the application and the patent and gives the appended legend:

| Application Claims | Borah Patent Claims |
|---|---|
| | *   *   * |
| 1. ABC + UL | |
| 2. ABC + UL | |
| 3. ABC + UL | |
| 4. ABC | 4. ABC + UL + YZ |
| 11. ABC + UL | |
| 12. ABC | 5. ABC + UL + Y |
| 13. ABC + UL | |
| | *   *   * |

ABC — Basic Borah press and mold structure
   U — Upper intermediate mold section
   L — Lower intermediate mold section

*   *   *

   Y — Spring-kicker
   Z — Fluid cylinders or other pressure equalizers on vertical shafts

Appellant's plaint is that he has maintained a "clear line of demarcation" between the claims of the first and second applications throughout the prosecution, including in all patent claims "elements not even so much as known at the time the present application" was filed, meaning such elements as "Y" and "Z". Having thus limited his patent claims, he further points out that this "leaves the appellant in the position where he cannot prevent infringement of his basic concept if the infringer merely omits from the infringing structure the 'spring-kicker', 'pressure equalizers' and/or 'article knockout mechanism'." He says that his being in this posture "was due solely to Patent Office procedure and was not the fault of the appellant."

The Patent Office, in the examiner's answer, proposed that if he had gotten into that box he could get out of it through reissue procedures. That possibility terminated on May 16, 1963, two years after the Borah patent issued. 35 U.S.C. § 251. The solicitor's brief now proposes that he could have kept himself out of his present predicament through either of two alternatives:

Upon developing his improvements of the basic apparatus, appellant had the clear choice of (1) filing a continuation-in-part application to include both the basic subject matter and the improvements or (2) filing a separate application on the improvements. The former course was indicated if there was any question

as to whether the improvements were *separately patentable*. The latter course was proper only *if appellant had no doubts* as to the patentable nature of the improvements and was willing to defend that position on the merits. By choosing to file a separate application, appellant assumed the risk of the possible issuance of that patent before an issue was reached on his earlier application, and the consequent risk of possible loss of the broader protection sought in the basic application claims. [Emphasis ours.]

The above suggestion as to the continuation-in-part procedure implies that the claims would *all* have been allowable in a *single* application from which it would seem to follow that the only reason for refusing them now is that the patent has issued, its term is running, and the granting of the appealed claims would result in timewise extension of the patent protection already granted, inadequate though it may be as protection.[3] There can be no doubt that if appellant obtains a patent with the appealed dominating claims, if he files no terminal disclaimer, and if some court in the future sustains those claims, they will result in an extension of the period of his protection beyond the expiration date of the patent he now has. The question is: Is this fatal to his rights? We think not.

### Opinion

Because of the complexities of the law of "double patenting" in its many guises, we would like to restate the situation here as we see it in its simplest form, using appellant's symbolism. He made an invention which we can call ABC + UL, a mechanical combination. He made an improvement on it which consists in adding Y. He did not then proceed to ask for a patent on the improvement of ABC + UL which consists in the addition of Y, "particularly pointing out and distinctly claiming" the *addition* of Y to *be* his invention, as 35 U.S.C. § 112, 2nd par., would seem to indicate he should do. He conceived his invention to be a *new combination* he had invented, ABC + UL + Y. This is the situation as to patent claim 5. The situation as to claim 4 is that he says he has invented ABC + UL + YZ. Otherwise stated, he claimed his invention to be the *totality* of his apparatus *as improved,* which apparatus contains, of necessity, the basic apparatus as described in his original application and as claimed in the appealed claims. All this occurred, of course, while both applications were pending, the record disclosing the following time sequence:

| | | | |
|---|---|---|---|
| 29 | Feb. | 1960 | first application filed (at bar) |
| 27 | June | 1960 | office action |
| 12 | Aug. | 1960 | second application filed (now patent) |
| 22 | Dec. | 1960 | amend first application |
| 18 | Apr. | 1961 | office action in first application |
| 16 | May | 1961 | reference patent issued |
| 20 | July | 1961 | amend first application |
| 28 | Nov. | 1961 | office action, double patenting rejection |
| 23 | Feb. | 1962 | amend first application |
| 5 | April | 1962 | FINAL rejection |
| 17 | July | 1962 | amend first application |
| 3 | Oct. | 1962 | appeal to Board of Appeals |
| 2 | Jan. | 1964 | Board's 1st decision |
| 5 | Feb. | 1964 | Board denied rehearing |
| 2 | Mar. | 1964 | appeal to CCPA |

---

3. The extension-of-protection objection might have been obviated by a terminal disclaimer under 35 U.S.C. § 253 but the record shows no attempt on the part of appellant to avail himself of this possibility. See In re Robeson, 331 F.2d 610, 51 CCPA 1271, and In re Kaye, 332 F. 2d 816, 51 CCPA 1465.

With respect to these dates we note the fact that but for the rejections that have been *reversed* by the board and the double patenting rejection now before us, a patent on the application at bar could have issued in 1961, within a few months of the date of the Borah patent, and there would have been very little timewise extension of protection. Cf. In re Sarett, 327 F.2d 1005, 51 CCPA 1180.

We also note that in the 18 April 1961 action, when the examiner had both applications before him, nothing was said about the second application or any attempt made to apply Rule 78(b).[4]

The application of the law to the foregoing facts is not without difficulty as the law and its past application are not without confusion.

The view of the examiner as expressed in his answer before the board was that the applicable rule of law is that which forbids more than one patent on *one* invention and that the appealed claims and patent claims 4 and 5 are all directed to the *same* invention. He seemed to recognize that the patent claims defined different combinations from the appealed claims but appears to have regarded them as directed to the same invention because the differences (the inclusion of element Y or elements YZ, supra) were unpatentable differences and all claims were simply for "various permutations and combinations of elements of the same basic apparatus, for example by merely omitting the structure which permits inversion of the intermediate mold."

The board summarily reversed the examiner on the appealed claims containing the limitations to the inversion apparatus, used by the examiner as an example of a mere "permutation." It sustained him, however, as to the claims which differed from the patent claims in omitting the spring-kicker apparatus and the hydraulic pressure equalizing cylinders, Y and Z. All we have to decide is whether this was legally proper. We think it was not.

The law relied on by the board was, first, Miller v. Eagle Mfg. Co., 151 U.S. 186, 198, 14 S.Ct. 310, 315, 38 L.Ed. 121 (1894), from which the board quoted the following:

> * * * it must distinctly appear that the invention covered by the later patent was a separate invention, distinctly different and independent from that covered by the first patent; in other words, it must be something substantially different from that comprehended in the first patent. It must consist in something more than a mere distinction of the breadth or scope of the claims of each patent.

Considering that this statement was made in the context of two patents claiming the very same spring and that the claims contained no structural difference whatever, it would appear that appellant is in full compliance with whatever rule the above passage is assumed to state. Another generality of the Miller opinion,

---

4. The rule reads:

Where two or more applications filed by the same applicant * * * contain conflicting claims, elimination of such claims from all but one application may be required in the absence of good and sufficient reason for their retention in more than one application.

Sections 822 and 822.01 of the Manual of Patent Examining Procedure implementing the rule are also relevant. The latter states, in part:

Where claims in one application are unpatentable over claims of another application of the same inventor (either because they recite the same subject matter, or because *the prior art shows* that the differences do not impart a patentable distinction), a complete examination should be made of the claims of one application. The claims of the other application may be rejected on the claims of the one examined, *whether the claims of the one examined are allowed or not.* [Last emphasis in original, other one ours.]

which immediately precedes that quoted by the board, is:

> \* \* \* where the second patent covers matter described in the prior patent, essentially distinct and separable from the invention covered thereby, *and claims made thereunder*, its validity may be sustained. [Emphasis ours.]

It may safely be said that such generalities are not of much help, for what is the meaning of "essentially distinct and separable," of "substantially different" and similar phrases?

The only other authority cited by the board is a case primarily relied on by appellant, our decision in In re Stanley et al., 214 F.2d 151, 41 CCPA 956. From it the board extracted two rules, the one-invention-one-patent rule of Miller v. Eagle Mfg. Co. and the rule "that two patents may not issue for different *forms* of the *same* invention when they are not inventively different." (Our emphasis.)

The actual decision in the Stanley case was that claims to a "generic invention" in a first-filed application were *not* rendered unpatentable by the issuance of a patent on a later application to one other than the inventor (there being a common assignee) on an *improvement* of the generic invention. The similarity to and the difference from the instant case is evident. The element present in Stanly and not present here is that the generic and improvement inventions could not have been included in a single application because of different inventorship. However, we do not consider that difference to be important here. In Stanley, this court sanctioned, in 1954, the issuance of a dominating patent to the owner of the improvement patent which had issued in 1950, notwithstanding the owner's protection would thereby be extended beyond the expiration of the improvement patent by several years. We see, therefore, that as a matter of law the extension of protection objection is not necessarily controlling.

Even closer to the present situation is the case of In re Calvert, thus summarized in the Stanley opinion (214 F.2d p. 157, 41 CCPA, p. 964):

> The case of In re Calvert, 97 F.2d 638, 25 C.C.P.A. (Patents) 1333, involved a fact situation very similar to that now before us, with the exception that the same inventor was involved in both the patent and the application. There the appellant had filed his application on a broad invention, and about four months later filed an application on an improvement over the broad invention. A patent first issued on the improvement, the claims of which were then used to reject the claims to the broad invention. The sole issue before this court was the rejection on double patenting. We reversed the Board of Appeals because we were of the opinion that the claims of the patent required the presence of a specific element not found in the claims to the generic invention.

A unanimous court said in Calvert (97 F.2d p. 640, 25 CCPA, p. 1337) that it reached this result on the basis that the appealed claims differed from the patent claims "in subject matter and scope \* \* \* and are patentably distinguishable therefrom." The difference was that the patented article claims, directed to a rubber hydrochloride film, contained, by comparison with the application claims, an added ingredient to retard photochemical disintegration. The precise basis on which the court found that this was a "patentable" distinction does not appear.

This brings us to what we regard as the crux of the present case. Are the distinctions here, residing in the presence or absence of the elements Y or YZ in the combination, patentable distinctions? As we view the matter—and we think the Patent Office takes the same

view—the question is whether such differences would have been obvious to one of ordinary skill in the art. .

■ As to Y, the spring-kicker, the board reasoned thus:

> Since a spring is a well known expedient, often used to apply a basing [biasing] force, it is our opinion that the *omission* of the springs does not so change the scope of claim 1 that it distinguished patentably over claim 5 of the patent. [Our emphasis.]

As to all other claims, the same reasoning was applied. We cannot accept this reasoning and the conclusion of no patentable difference to which it led. The obviousness is not a question of omitting, but of *adding* spring-kickers. The board seems to have been reasoning in reverse, treating the subject matter of the patent claims as if it were prior art and then reasoning that it would be obvious to omit the springs if a biasing force was not wanted. Even if the board was not doing this, it was not justified in holding that adding spring-kickers, as defined in the patent claims, was obvious and not a patentable distinction on the basis of bald assertion *unsupported by any prior art reference*. We do not feel that the mere fact that springs are well-known biasing devices is enough to suggest the modification made by Borah in his mold handling apparatus. He does not merely attach a spring to something to be biased; he employs four springs in a particular manner in association with four particular shafts in claim 5. In claim 4 his spring-kicker apparatus is defined in even greater detail, shown supra. It is certainly no more obvious, in our view, than the structural details, made up of ancient mechanical elements quite as old and well-known as springs, which enabled the lower intermediate mold section to be inverted and which the board found a sufficient "patentable" distinction.

Really, the whole issue turns on comparison of the appealed claims with claim 5 as it has the minimum difference, the inclusion of the spring-kicker arrangement. But in rejecting claims 12 and 13, claim 4 of the patent, with its added difference Z, the hydraulic equalizers, was also relied on [5] and so we will consider the board's view of the obviousness of improving on the basic invention by adding the equalizers. The board said:

> As it is common practice to provide hydraulic means to move a member, it is our opinion that the omission of this means amounts to the omission of an element and its function, and the claim differs only in scope over claim 4 of the patent.

We again see the reasoning about the *omission* of an element known to be present in a structure, which is not a question involved in the issue. The obviousness issue turns on the addition of structure, the obviousness of the improvement defined in the patent claim, not the obviousness of the basic structure, given the improvement as prior art, which it is not. The board, moreover, seems to be applying the well known negative test for patentability, namely, that it cannot be based on the *mere* omission, *from a prior art structure*, of an element together with its function. We have no prior art here. Tacked onto this logical error, furthermore, is the non sequitur that because the only difference from the patent claim is the omission of one of its elements, therefore the difference is only one of "scope."

■ Here again no prior art is relied on to show that the improvement residing in the hydraulic equalizers would be obvious. Appellant was not merely using a hydraulic means to move a member but has plural cylinders arranged in a specific way on plural specific members to achieve a particular result which seems to us quite as unobvious as anything else in his structure, found by the Patent Of-

---

5. The board seems to have been confused in discussing claim 13 as it speaks of claim 5 setting forth a hydraulic cylinder, which is not the fact. We therefore assume it intended reference to claim 4.

fice to be patentable subject matter, tested against prior art, as evidenced by the issuance of the patent and by the withdrawal or reversal of every rejection of the appealed claims except the double patenting rejection.

The solicitor's brief cites several cases for the proposition that the differences between the appealed and patented claims must be patentable differences. We need not discuss them as we agree. It quotes from In re Simmons, 312 F.2d 821, 50 CCPA 990, in support of the obviousness test for determining patentable difference. That case typifies several others with respect to the manner in which obviousness is to be determined. There the improvement made by Simmons over subject matter claimed in his prior patent was found to be obvious in view of the prior art Ransburg patent. A similar situation was present, in that prior art was relied on, in In re Kiekhaefer, 299 F.2d 866, 49 CCPA 943, and In re Eckel, 317 F.2d 401, 50 CCPA 1248, cited. At the argument reference was made to In re Christensen, 330 F.2d 652, 51 CCPA 1236. That case is not in point as we found there the *same* invention was defined in the appealed and patented claims, not plural inventions as here, basic and improvement. In re Zickendraht et al., 319 F.2d 225, 50 CCPA 1529, also cited, was a case in which there were two inventions but the court held no patentable distinction between them had been shown.

Finding, as we do, that the Patent Office was not justified in finding no patentable difference to exist between the appealed claims and the patent claims relied on, its holding of double patenting is reversed.

Reversed.

WORLEY, C. J., concurs in result.

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge Worley, pursuant to provisions of